AMANDA BUCKMASTER, ADMINISTRATRIX, &c., APPELLANT, vs. GEORGE KELLEY AND OTHERS, RESPONDENTS.

1. It is not a valid objection to the competency of a witness produced on the part of the defendant that he had been the attorney of the plaintiff, and he may testify as to any facts except such as came to his knowledge by means of his confidential relations with his client.
2. Where a mortgage was given to secure a promissory note, payable in four months, and no suit brought until fully nineteen years after the note became due, and no proof that any portion of the principal or interest had ever been demanded, and the mortgagor having died, the note and mortgage not being found among his effects, and the administratrix, the widow of the mortgagee, never having had any knowledge of their existence, and there being no proof tending to show what had become of the note and mortgage, the administratrix not bringing suit until after this long time had elapsed on being informed that the mortgage was not cancelled of record; upon answer of payment, *held:* that payment would be presumed on account of the lapse of time and other circumstances shown.
3. Upon foreclosure of a mortgage upon an undivided interest in lands, the court cannot make a decree of partition of the lands among the several owners and claimants.

Appeal from the Circuit Court for Duval county, Fourth Judicial District.

The opinion of the court contains a statement of the case.

*C. P. Cooper* for Appellant.

The issues are as follows:

1. Payment or non-payment as a matter of fact, or of legal and equitable presumption in each case.

2. Whether believing that they were obtaining perfect titles without actual personal notice, but with record notice, will protect defendants in equity.

3. Whether plaintiff, if entitled to foreclosure in either case, or in both cases, is or is not entitled to foreclosure not merely on unimproved land but also to the improvements to the extent of her mortgage claims in the premises.

Plaintiff relies on establishing want of payment of either

of said mortgages on the fact that the record of both of said mortgages appears uncancelled. See certified copies of mortgages attached to original complaints and used in evidence before referee. Also statement of referee of examination of original record by him, and the want of cancellation confirmed. Also corroborating testimony of Mrs. Buckmaster, raising strong presumption of want of payment of said mortgages.

. Absence of original notes and mortgages accounted for by Mrs. Buckmaster, at least presumptively, and sufficiently to allow certified copies to be used in evidence. Thomp. Dig., 343.

Defendant relies on presumption of payment from lapse of time. The rule has been established that twenty years must elapse before that presumption can be raised, unless the usual course of dealing of the parties, or some positive act of the plaintiff himself, corroborates or confirms or creates the presumption. 2 Green. Ev., par. 528; Best on Pre., 187–8–9.

And even after the lapse of twenty years presumption of payment may be rebutted, for instance, by evidence of plaintiff's absence abroad, or other circumstances. 2 Green. Ev., par. 290–1; 1 Stark. R., 101.

"The principle on which presumption of payment arises from lapse of time is a reasonable principle, and may be rebutted by any facts which destroy the reason of the rule." 2 Cranch U. S. S. C. R., 180, decision rendered by Chief Justice Marshall.

"No less time than twenty years will raise a presumption that a mortgage term has been assigned or surrendered." 5 Taunton, (1 Eng. Com. L. R.,) 170.

The presumption of a debt once proved to have existed is in favor of *and not against* its continued existence, unless payment or some other discharge be either proved or established from circumstances. Best on Pre., p. 187, par. 137.

The equitable principle of presumption of payment from

lapse of time is analogous to the statute of limitation, and is an artificial presumption based on the same legal fiction as the statute of limitation. See Best on Pre., p. 187, par. 137.

This being so, every impediment to the operation of the statute of limitation would be equally an impediment to the application and consideration of the equitable principle sought to be invoked by defendants. And the answer to all this is—

1. *Twenty years had not elapsed* from the accruing of the cause of action to the time of the commencement of suit.

2. The mortgagee moved to Georgia and died there many years ago, where his family have ever since continued to live, and are protected by the principle of "being beyond seas or out of the country," and of being under disabilities, having been a *feme covert* and minors, and the plaintiff now being the administratrix of an unsettled estate. Thomp. Dig., 443-4.

3. A civil war continued for four years of the time when the courts were virtually suspended and the records inaccessible in Duval county, (of all which the court will take judicial cognizance,) preventing action on the part of the plaintiff in the premises.

4. The statutes of limitation in Florida were suspended by act of Legislature, approved December, 1861, and only revived in 1872. This suspension applied to the statutes of limitation affecting real estate. 14 Fla.

In the case at bar payment is not proven, and cannot be presumed, unless it can be established by Wheaton's testimony in the matter of the Kelley mortgage. Let us see—

1. Wheaton was an incompetent witness, having been of counsel for the plaintiff, and filed the original papers in both of said causes, including the original complaints, in which he alleged that no payments had been made.

Plaintiff's exceptions to the admission and consideration of his testimony should have been sustained. The court below erred in considering Wheaton's evidence. Green.

Ev., Sections 237–8–9–40, and case cited from 19 Vesey, 267, at bottom of last Section; Cooley's Con. Lim., 337; 11 Ga., 47.

2. Even if considered it proved nothing. He only testifies to seeing a paper *endorsed* to the effect that it was a mortgage from Kelley to Buckmaster, in the possession of Kelley after Buckmaster had removed from Florida. He never opened it and never saw its contents.

In many particulars his evidence conflicts with that of W. M. Ledwith and Mrs. Buckmaster, and with the power of attorney given him by Mrs. Buckmaster endorsed on the copy letter of administration, dated at the time he testifies to as having had the only interview with her, and conflicts with the allegations of the complaint prepared and signed by him as attorney, and filed in the Kelley case by him, and conflicts with the express statements of the Wooten mortgage, and is inconsistent with the facts. The time of alleged payment of the Buckmaster mortgage, and the date of said Wooten mortgage, show an interval of about two years, during which Kelley, according to Wheaton's testimony, must have kept the money designed for the payment of the Buckmaster mortgage, which is unreasonable, particularly with debts and even judgments pressing him in the mean time, as the testimony and record disclose, as is shown by Wheaton's own testimony and the copy of judgments in evidence, and the copy of deeds based on said judgments.

If his testimony amounted to anything in the case, his total want of credibility is indisputably established. Hence there is nothing left to hang the least showing upon that payment has been made in either the Kelley or Lambeth case.

On the second branch, namely: that the present occupants, the defendants Wallace and the representatives of Jed Frye, deceased, believed that they were obtaining perfect titles, and bought without personal notice of the Buck-

master mortgages, although the existence of the mortgages recorded is conceded, will not protect them against the prior mortgage liens, and they bought subject to the principle of *caveat emptor*. Record is notice. Thomp. Dig., 180; 1 John. Ch. Rep., 394; 1 Story's Eq. Jur., par. 403; 2 ib., Sec. 850; 22 Howard's U. S. S. C. R., 325.

In all the authorities where it alleges that equity will protect *bona fide* innocent purchasers, who buy believing they obtain perfect titles, it will be discovered on examination that the belief must have been caused by action on the part of the plaintiff amounting to fraud, deceit or imposition. It is not a mere belief which the plaintiff has had no agency in creating, and which is the result of bad advice of defendants' own counsel or attorney, with the record accessible to him, as was the case here as shown by the testimony.

For this the plaintiff is not responsible. Being equally innocent, the plaintiff, being first in time, is first in right. "*Prior tempore potior jure.*"

Wallace and the Jed Frye heirs acquired title since the war. The purchases under which they claim, were made after the records were in the legal custody of the proper officials of the county, and easily accessible; hence, they have no excuse on the score of want of notice. Buckmaster's heirs were in another State, and did not stand by and see them buy, and throw them off their guard. Said Chief Justice Marshall in Rankin and Schatzell vs. Scott, 12 Wheaton, 177, "the principle is believed to be universal, that a prior lien gives a prior claim, which is entitled to prior satisfaction out of the subject it binds, unless the lien be intrinsically defective, or be displaced by some act of the party holding it, which shall postpone him in a court of law or equity to a subsequent claim."

This principle was recognized by the Supreme Court of Florida in Moseley vs. Edwards. 2 Fla. S. C. R., 434.

In Edwards vs. Moseley just cited, the Supreme Court of Florida decide that the lien of a judgment is not lost by the

expiration of a year and a day, the common law time for its enforcement, and that mere delay to sue out execution does not destroy the lien of a judgment.

By analogy the lien of a mortgage is not lost by mere delay to enforce it. In truth the similarity between a mortgage and judgment lien and liens of the same general character, is expressly noticed on page 434 of the case cited.

On page 435 of said authority, the case of Ridge vs. Prather, 1 Blackford's Indiana Reports, from page 401 to 405, is cited approvingly. " Ridge in that case pleaded that he was a *bona fide* purchaser without notice, after the expiration of a year and a day from the time of the judgment on the replevin bond, and before the issuing of the *scire facias*. Upon demurrer to this plea there was judgment for Prather, the plaintiff, in the Circurt Court, and this judgment was affirmed by the Supreme Court, after a full discussion and a thorough examination of the principles upon which it was founded." So say the Supreme Court of Florida.

The parallel between the case of Ridge vs. Prather, in several prominent particulars, and the case at bar, is too apparent and striking to need pointing out. Both are admitted prior liens—in one it is a *judgment* lien, in the other, *mortgage* liens.

1. In both the defence is delay to enforce the liens until legal or equitable bars intervene by lapse of time, and hence presumption of payment.

2. That the present occupants are *bona fide* purchasers for valuable consideration without notice. If the Indiana Supreme Court was correct in its ruling on these points in Ridge vs. Prather, and the Supreme Court of Florida in Edwards vs. Moseley, then the court below in the case at bar erred in its rulings.

On the third branch or issue, namely, was the plaintiff entitled to foreclose on the improvements as well as on the land, to the extent of the mortgage interest she represented?

13

we assume the affirmative, and will argue it on the hypothesis, first, that the mortgage of a tenant in common only stands on as good a footing as the tenant in common, his mortgagor would have done in reference to his co-tenants in common, on the subjects of improvements made on the common and joint property without their knowledge and consent.

At common law one tenant in common has no exclusive right to improvements put upon the land by himself. 1 Wash. Real Prop., mar. pages 415 and 427; 1 Story's Eq. Jur., Sec. 653–5.

Equity will sometimes allow the tenant making improvements on joint or common property, either the improvements or the value of them, in the partition or division of the land, but this is controlled by strong equitable circumstances in every such case, and it is in contravention of the common law principle to the contrary, and in every case adjudicated, wherein this equitable principle has prevailed, it will be seen on examination that the other tenants in common have themselves been in direct fault, either by creating false impressions or by acts of fraud on their part, or something of that kind. Wherever the text books have stated the proposition broadly, that equity will grant to a co-tenant the improvements made by him on common property, it will be found on consulting the adjudicated cases, cited at the bottom of the very same page of said text books in support of the rule or proposition thus broadly stated, that the principle thus laid down is explained and modified and narrowed down in its application to cases in which equitable circumstances are to be found such as we have described.

Such will be found to be the case in 8 Price, 518; 1 Barbour, 500; 3 Paige, 470 and 546, and 1 John. Ch. 354, the standard cases cited by the text authors, (Story and others,) in support of the broad proposition laid down by them. In all these the improvements were made either

with the consent or the knowledge of the co-tenants, and sometimes with the avowed intention of those standing by and seeing the improvements going on of taking advantage of them. Hence these cases do not sustain the text, or at least only sustain it partially, and to a limited extent.

There are no facts or circumstances in the case at bar that make it a parallel one to either of those cited—no such equitable circumstances as characterize either or any of these are to be found here—so the equitable principle cannot attach to the case at bar, so as to except it from the common law rule. The common law principle or rule then must obtain in this case. In the case in 3 Paige, page 546, (which is a leading case,) the decision was put upon the ground of fraud, the tenant claiming part of the improvements, having stood by for seventeen years with the avowed purpose of allowing the other to make improvements, (the one making the improvements believing that he had good titles,) and then of taking the benefit of the improvements. And this case in Paige was decided upon the authority of Wendell vs. Van Rensalear, (the case referred to in 1 John. Chan., page 354,) where a person having title to an estate allowed another to purchase and make great improvements, and kept his title secret for a great number of years, and was enjoined by Chancellor Kent from setting up his claim, upon the ground that *knowing* of the improvements being made and keeping his title secret, amounted to fraud.

In neither of these cases does there appear to have been any record of title. It is to be observed that the case of Wendell vs. Van Rensalear does not concern tenancy in common, but that the party having title was not allowed to take the improvements on account of his fraudulent conduct, showing that the subsequent ruling in Paige was not based on any general rule or principle of allowing tenants in common for their improvements, but only upon the question of fraud in the particular case, and the general principle in

equity that a party shall not be allowed to take advantage of his own wrong.

The case in 1 Barbour, page 500, was decided upon authority of that in Paige, and there the tenants joined together to build on the land, and one of them objected on account of the size of the house. By the decree of the court the tenant who built was allowed only so much as would have been the other's share of expense for building a house of the size agreed on between them.

It is true, that in the case just cited, the doctrine of allowing for improvements is laid down very broadly, but the case did not require it, and the broad rule, as therein stated, was not supported by the authorities cited by the Chancellor, and was not acted on by the court itself in the decree rendered, wherefore it was mere *dictum*.

If the property cannot be divided equitably, it may be sold by order of the court and the proceeds divided, or one party may be allowed owelty or a sum of money to make up his share. 1 Wash. Real Prop., mar. p. 427; 1 Story's Eq. Jur., par. 454.

But a mortgagee occupies a better position than a mere tenant in common in the matter of improvements. 8 Price, 518; 22 Howard's S. C. R., 325.

It is evident that the mortgagee does not stand entirely in the same position, or on the same footing as the tenant in common, his mortgagor, for the reason that on partition between tenants in common of the land, equity will decree a proportionate share of the rents and profits between the tenants in common, even as against the tenant who has had the exclusive possession, use and enjoyment of the land. See 1 Washburne on Real Prop., mar. p. 420, Sec. 14, and 1 Story's Eq. Jur., par. 655.

This would not necessarily inure to the mortgagee of one of the tenants in common on foreclosure of his mortgages, and could only be claimed by his mortgagor as one of the tenants in common.

Hence, the mortgagee being in a worse condition in this respect than his mortgagor, equity will protect him in his legal rights more rigidly in foreclosing his mortgage than it would probably have protected the tenant in common in the matter of partition of the land as against a tenant in common making improvements, the tenant in common having an advantage or benefit in the matter of rents and profits which the mortgagee would not and could not have had, and having a right to consent or object to the erection of the improvements, which he, as mere mortgagee, would not have had a legal right to exercise.

*H. Bisbee, Jr.*, for Respondents.

When a party has been in possession of real estate supposing himself to be legally entitled to the whole premises, and has erected valuable improvements thereon, he will be entitled to an equitable partition of the premises, so as to give him the benefit of his improvements. 1 Story's Eq. Jur., Sec. 655, 656; 3 Paige R., 546, 555; ib., 470; 4 Abbott's N. Y. Dig., 288, No. 128; 3 Sand. Ch. R., 64; 1 John. Ch. R. 554.

The court, by its decree, will adjust all the equities of the parties, and, if necessary, give special instructions to the commissioners, and will nominate them. 1 Story's Eq. Jur., Sec. 656; 4 Barb. R., 228.

Equity has jurisdiction to decree a partition of real estate. 1 Story's Eq. Jur., Secs. 653, 658, 656; 10 Paige Ch. R., 473.

Payment of a mortgage security will be presumed after the lapse of twenty years without any evidence of payment at all. 1 Vol. Phil. Ev. mar. p. 675 and note 193; 12 Vesey, 266; 3 P. Wms., 396.

It is a rule established by courts of equity, and it is not necessary that the exact period of twenty years shall have elapsed; several months, or even one or two years, short of that period, may be sufficient. 2 McCord Ch. R. 435,

439; 2 Wash. C. C., 323; 1 Vol. Phil. Ev., 678, note 193; 10 John., 381, 387; 1 Ill. R., 50; 7 Wendell R., 94.

This being the rule, the case of the appellee is peculiarly strong, for the plaintiff has not even the possession of the mortgage security, and there is testimony showing that it was in the hands of the mortgagor after maturity.

RANDALL, C. J., delivered the opinion of the court.

The appellant was appointed by the court of ordinary in Georgia in 1866 as administratrix of the estate of her husband, Edward J. Buckmaster, who died in that year, and brought two suits in equity in the Circuit Court of Duval county for the foreclosure of two several mortgages. One of the suits was upon a mortgage executed December 3, 1853, by George Kelly and wife to Buckmaster, to secure the payment of a note of Kelly of $1,200, due four months after date, and covered an undivided one-half of twelve acres, upon which was a mill. In this suit Alexander Wallace, R. Dorman, R. Hicks and the heirs of Jed Frye and others were defendants. The other suit was for the foreclosure of a mortgage, executed by John E. Lambeth to Buckmaster, covering an undivided one-fourth of the same twelve acres, to secure the payment of two notes dated July, 1, 1854, for $1,058.33, and $1,128.33 respectively, due May the 1st, 1855, and May 1, 1856. Lambeth was the only defendant.

The first named bill was answered by Dorman, Wallace and the heirs of Frye. Wallace and Frye's heirs answered that they were in possession of the property as purchasers in good faith, and had purchased upon advice that the title was good, and allege that the mortgage and notes of Kelly were paid and satisfied. The suit upon this mortgage was commenced in April, 1873.

No answer was filed in the suit against Lambeth.

By stipulation of counsel the two suits were consolidated. In the suit upon the Kelly mortgage the complainant

prayed that the interest of Wallace might be partitioned and set off to him, together with his improvements. Wallace and others had built a mill on the property in place of the former mill covered by the mortgage, which had been burned before he purchased. They also pray for a partition before sale.

Upon the pleadings and testimony the court decreed that the Kelly notes and mortgage were paid and satisfied; that the undivided one-fourth, covered by the Lambeth mortgage, be sold to satisfy the Lambeth notes, and that commissioners be appointed to partition and set off the one-fourth, in severalty, to be sold.

From this decree the complainant appealed.

The defendants Wallace and Frye rely upon the lapse of time and other circumstances connected with the Kelly mortgage, as presumptive evidence that it is satisfied by payment. The note became due April 3, 1854, and the bill was filed April 15, 1873, being fully nineteen years. After the execution of the mortgage by Kelly to Buckmaster, Kelly, a short time before the money became due, to wit: February 26, 1854, executed another mortgage for $3,738.50 to Mary L. Wooten, which latter mortgage was foreclosed in 1856, and Mrs. Wooten became the purchaser, and afterwards conveyed to Hicks, one of the defendants in this suit upon the Kelly mortgage. Wallace, in his answer, asserts that the Kelly mortgage was satisfied out of the money raised on the Wooten mortgage. The testimony discloses also that after 1853, Buckmaster removed with his family to Georgia, and resided there until 1866, when he died. Mrs. Buckmaster testifies that at some time after removing to Georgia, she heard her husband speak of his mortgages in Florida, including the Kelly and Lambeth mortgages, as existing mortgages which had never been paid, cancelled or foreclosed, and in connection had heard him say that the only mortgage he had in Florida, which had been paid or foreclosed, was one held against a house and lot of Mr. De-

cottes. She remembers to have seen papers, among the papers and effects of E. J. Buckmaster, as late as about 1875, marked, "Papers in the business of Buckmaster, Timanus and Kelly," or words to that effect, but never examined them. Since her attention was called in 1873 by F. I. Wheaton to the Kelly note and mortgage, the subject of this action, she has carefully and diligently searched for said papers, presuming the original note and mortgage were among them, but failed to find them, and therefore believes that they were lost or destroyed. There was no testimony showing that any interest had ever been demanded or paid on this note and mortgage, nor that any attempt had ever been made to foreclose or collect the money. Kelly left Florida after 1856. He and Timanus owned the former mill on the premises, and it is inferred from the testimony that Kelly, Timanus and Buckmaster were jointly interested in the mill, and that Buckmaster sold his interest to Lambeth. Wheaton testifies that in 1856 he saw the note and mortgage executed by Kelly, in Kelly's possession, in his, Wheaton's office, in Jacksonville, where Kelly called to settle some rent with Judge Pearson, the note and mortgages being among Kelly's papers, though he says he did not open and read the mortgage, but saw the endorsements on the back of it. Mrs. Buckmaster testifies that Wheaton came to her to obtain permission to foreclose these mortgages, and did not intimate that either of them had been paid. Mr. Ledwith testifies that Wheaton, who commenced the suits as plaintiff's attorney, told him, on turning the suits into the hands of Cooper and Ledwith, that he knew of no reason why the money should not be collected on foreclosure.

The first question made by appellants is upon the admission of Wheaton's testimony, he having been plaintiff's attorney in the commencement of the suits, and afterwards being a witness and attorney in behalf of the defendants, Wallace and Frye. This general objection is not tenable.

There is no reason why any fact, material to the issue, may not be shown by either party by the testimony of an attorney on either side, provided the facts proposed to be proven were not obtained by him in the confidence of attorney and client. It is not shown in the testimony that Wheaton disclosed any material fact which was communicated to him in such confidence. His testimony, therefore, should be received upon the same footing as the testimony of other witnesses.

The next error alleged is, that the court found and decreed that the Kelly mortgage and note were paid and satisfied. Here it will be observed the period of nineteen years had elapsed after the mortgage debt became due before suit.

The doctrine, that after the lapse of twenty years a jury might presume a bond to be paid, was first laid down by Lord Hale, and in this he was followed by Lord Holt, who held that if a bond be of twenty years standing, and no demand proved, or good cause shown for so long forbearance on *solvit ad diem*, he should intend it paid. The same doctrine was afterward held by Lord Raymond, in the case of Constable vs. Somerset, (reported in 6 Mod., 22.)

In Rex vs. Stephens, 1 Burr., 434, Lord Mansfield says there was not any direct and express limitation of time when a bond should be presumed to have been satisfied; the general time, indeed, was commonly taken to be about twenty years; but he had known Lord Raymond to leave it to a jury upon eighteen years. And in Hull vs. Horner, (1 Cowp., 109,) he said the jury might presume the debt to have been discharged where interest did not appear to have been demanded or paid for sixteen years; but if a witness is produced to the contrary, as by showing the obligor not to have been in solvent circumstances, or a recent acknowledgment of the debt, the jury must say to the contrary. In Darwin vs. Upton, (2 Saunders R., 175, C.,) the same judge says, the jury may presume the debt to be discharged if no interest appears to

have been paid in sixteen or twenty years. And in Oswald vs. Leigh, 1 T. R., 272, Lord Mansfield said there was a distinction between length of time as a bar and where it was only evidence of it ; the former was positive and the latter only presumption, and that in case of a bond it might be eighteen or nineteen years.

Lord Ellenborough, in Colsell vs. Budd, (1 Camp., 27,) says there must be a lapse of twenty years, or a less time, with some circumstances to strengthen the presumption, and very slight evidence is necessary. The Supreme Court of New York, in Clark vs. Hopkins, (7 Johns., 556,) refused to allow a judgment to be entered upon a bond and warrant of attorney after the lapse of eighteen years.

The same court, in Jackson ex d. Martin vs. Pratt, (10 J. R., 381,) Kent, C. J., says, where no possession had been taken under a mortgage, nor any interest paid, nor steps taken to enforce it for nineteen years, it was held not to be a subsisting outstanding title, and that a jury might well presume it satisfied, without auxiliary circumstances.

In Blake vs. Quash, (3 McCord, Law R., 340,) the court held that *fourteen* years, without demand of payment, or interest paid upon a bond, the attorney of the obligee residing in the immediate vicinity of the obligor meanwhile, and the attorney having a reputation for vigilance in like cases, raised a presumption of payment.

DeSaussure, chancellor, in Winstanley vs. Savage, (2 McCord Chy., 438,) says : " The court is not exact as to twenty years. It is not a statutory provision, but an equitable application of the principle to cases long delayed. And if there have been great neglect and lapse of time, and great mutations of the property, the court will not lend itself to support such stale claims." On appeal the decree was affirmed for the reasons given by the chancellor.

The general rule has come to be settled that in a suit upon a bond, the lapse of twenty years without demand or payment of interest will raise a presumption of payment, and in

order to rebut this presumption it must be shown affirmatively that the money has not been paid, and that if a long period, less than twenty years, has elapsed, some other circumstances must appear tending to the conclusion or raising the presumption that it has been paid; and there is no precise rule or quality or quantity of evidence prescribed. Each case must rest upon its own circumstances and address itself to the reason of the tribunal.

In the case at bar, we find that E. J. Buckmaster, the mortgagee, took a mortgage upon the undivided interest of Kelly in the real estate, to secure the payment of a promissory note of twelve hundred dollars, payable in four months after date. This was in 1853. The mortgagee was evidently a man of some business capacity, and was apparently careful in the conduct of his affairs. He received mortgages upon other real estate in the same locality for considerable sums —thousands of dollars. His mortgages were carefully drawn and placed on record. One, at least, of the mortgages was collected or foreclosed. Soon after the coming due of the Kelly note or mortgage, Buckmaster removed to Georgia, and we hear nothing more of the matter until a little over nineteen years afterwards the administratrix of the mortgagee is informed by Judge Wheaton that the mortgage is of record and not cancelled. Forthwith she sets about searching for it among the papers of the deceased and fails to find it or any trace of it. She then remembers that she had at some time after her husband's death seen a paper or papers marked, "Papers in the business of Buckmaster, Timanus and Kelly," or similar words. She had never opened them, for she does not know what papers they were. As Buckmaster, Timanus and Kelly had formerly had business transactions together, we cannot necessarily presume that this package contained a note and mortgage given by Kelly to Buckmaster. It is not shown that Buckmaster in his lifetime, took any especial care of these papers, and the administratrix, during seven or eight years of her administration

after her husband's death in 1866, has not seen, known or heard anything of such note and mortgage, nor had she ever seen them, so far as she shows by her testimony. She does not say that she had ever seen them either before or since her husband's death. Her testimony is given in such manner that she is evidently a person of intelligence and business capacity. She had an attorney living near her in Georgia, with whom she and Judge Wheaton conferred in 1873. It seems exceeding strange that Mr. Buckmaster, between April, 1854, when the note became due, and 1866, when he died, should have held notes amounting to thousands of dollars past due, (which, by law, would be barred by the statute of limitations long before the late war,) and never taken any steps to collect either principal or interest, or that some time during that period his wife should never have seen them if they were in existence, or that she had never heard of any efforts to collect the money. And it is quite as strange that from 1866 to the present time, while she has been the administratrix of the mortgagee, and having his effects in her possession, she has never found any such papers or any memorandum relating to them even to prompt her to make inquiry into the matter with a view to protecting herself and her family and enjoying the fruits of a collection. She says in her bill, and reiterates in her testimony, that the note and mortgage have never been in her possession, and are lost. However honestly she may make this declaration, we can scarcely realize how she can safely aver that they are "*lost*," if she has never seen them and has no evidence of their existence ; but the best of evidence of their non-existence is the fact that her husband left no such valuable papers among his effects, so far as she knows. It is true that she says that some time during his life-time she heard her husband "speak of his mortgages in Florida, including the Kelly and Lambeth mortgages, as existing mortgages, which had never been paid, cancelled or foreclosed ;" (language more like that of a lawyer than of a woman,) and yet,

as administratrix, she has made no effort to enforce this mortgage, which she says her husband spoke of as having "never been paid, cancelled or foreclosed." As a prudent woman, so reminded by the recollection of her husband's words, and aided by counsel, she would have done something towards ascertaining the condition of this important matter. As a prudent man, Mr. Buckmaster would naturally have taken some steps towards collecting this money, if it had not been paid, especially as it appears the money was to be paid in a short time (four months) from the date of the note ; and especially also, considering that the mill then upon the premises was afterwards burned, and the value of the property thereby greatly diminished, thus also hazarding the prospect of collecting the enhanced amount of interest added to the principal, the maker of the note having, also, as appears, gone to parts unknown after the year 1856.

The most plausible, and indeed, under all the circumstances, the only reasonable solution is, that the Kelly note was paid. And the fact that Kelly, a very short time before the note became due, executed a mortgage upon the same moiety of the property to Mrs. Wooten for a larger amount, strengthens the answer of Wallace, and the testimony of Judge Wheaton, in his impression that the Buckmaster mortgage was paid off out of the proceeds of the mortgage to Mrs. Wooten, and that Judge Pearson (who collected a claim for rent against Kelly) was the attorney for Mrs. Wooten, and also the attorney for Mr. Buckmaster generally in his business. "From the tone of the conversation," Wheaton says, " I was led to believe that a portion of the money borrowed by Kelly from Wooten was used in payment of the Buckmaster mortgage, Pearson representing Wooten in relation to that mortgage," and " Pearson represented Buckmaster generally in his business."

Counsel for appellant insist that Wheaton, having been contradicted by Mrs. Buckmaster and by Mr. Ledwith in regard to conversations had with them while Wheaton was

attorney of Mrs. Buckmaster, is not a credible witness. It is unnecessary to discuss this question. The conclusion that this mortgage debt is paid is arrived at independently of Wheaton's testimony, but the circumstances detailed, as we have said, go to strengthen the theory that it was paid out of the proceeds of the Wooten mortgage, that having been executed a short time before the Buckmaster money became due, and as the Kelly note to Buckmaster was on short time, the strong probability is that it was expected to be promptly paid, and as we never hear more from Buckmaster on the subject, the conclusion is legitimate that he received his money when he expected it The note and mortgage are not produced in evidence, nor is there proof of their loss or their absence accounted for by the complainant otherwise than by showing that they are not and never were in her possession, and that she never had any personal knowledge of their existence.

Mr. Justice Sutherland, delivering the opinion of the court in Jackson *ex dem.* vs. Sockett, (7 Wend., 94,) says that the statute of limitations having run on the note, and that statute being founded in part, at least, or, he might say, principally upon the presumption of actual payment, and the difficulty of proving it from lapse of time, though secured by mortgage, the jury may properly conclude payment, the mortgage not containing any covenant to pay, but being merely a security. This was concurred in by those eminent jurists, Chief Justice Savage and Justice Nelson. Without fully endorsing this doctrine, which has not been sanctioned in some other States, (see Belknap vs. Gleason, 11 Conn., 160,) it is a strong argument that the note nineteen years over due has been paid.

The third ground of error is, that the court decreed that a partition be made of the premises, and that one-fourth of the twelve acres, by admeasurement, be sold to satisfy the Lambeth mortgage, which is a mortgage of an undivided one fourth. The complaint upon the Kelly mortgage

prays, among other things, that partition be made of Wallace's interest, and that it be set off to him, and the parties in that suit stipulated and agreed that the premises could be partitioned without inconvenience or injury. There is no prayer, however, for partition in the bill of complaint upon the Lambeth mortgage, and there is no answer in the suit against Lambeth.

We do not see how it is practicable in this suit, brought to foreclose a mortgage, to make a partition. A suit for partition should not be joined with one for a foreclosure. The manner of proceeding in the suits is entirely different in the matter of process, parties, pleadings, issues and decree. There are cases in which a decree should direct portions of an entire mortgaged property to be first sold in order to save equitable interests, as where a part of the property has been purchased from the mortgagor subsequent to the execution of the mortgage, and this is a very familiar rule. The bill is defective as for a partition, because it fails to show who are *all* the parties interested in the entire tract of land, and so does not lay a foundation for a final decree of partition. The decree binds only the parties before the court. All the parties interested in the estate are necessary parties in partition, and it is very evident that in foreclosing a mortgage upon an undivided share, the court cannot determine the rights of all the parties in the whole. Some of the defendants in this suit are even at issue between themselves as to their titles.

This suit was brought while the "code of procedure" was in existence, but it will be found that such a joinder of causes of action is not provided for. (See § 117.) The provision of the code on this subject is substantially a repetition of the ancient rule. The practical difficulty is that the court cannot determine in one proceeding all the issues that must legitimately arise in both causes. The remedy by partition should precede the sale on a decree of foreclosure

or follow it.   The consent of the parties to join these incompatible causes of action cannot avoid the difficulty.

It is claimed that Wallace and other defendants have erected valuable mills upon the land, having purchased under the belief and upon legal advice that their title was good, and therefore they ask the protection of the court.   There need be no difficulty about this matter.   The partition preceding the foreclosure would doubtless have thrown the mortgage upon that portion set off to the mortgagor, and after foreclosure and sale the purchaser would stand in the right of the mortgagor as a tenant in common with other owners.   If there be parties who have made valuable improvements upon portions of the property which may be set off in a partition, under circumstances which entitle them to protection, the court of equity will protect them. (1 Hilliard on Mortgages, 13 ; 10 John. R., 414; 1 Barb. R., 500; 2 Sandf. Ch. R., 98.)

The joinder of two causes of action upon the two mortgages, by the consolidation of the two suits, is somewhat anamolous.   The mortgages are given by different parties, upon different shares or portions of the property ; the parties defendants in the suits have no common interests.   There are several necessary parties in one case, and but one in the other.   As the parties have consented to the consolidation, however, we leave them as we find them:

The decree of the court as to the Kelly mortgage is affirmed, except that if the mortgage be cancelled of record it should be done by an order directing the clerk to enter the cancellation.   The decree as to the Lambeth mortgage is affirmed, except as to the proposed partition.   The cause is remanded, with directions to the Circuit Court to reform the decree in accordance with this opinion.   Each party will pay one-half the costs of this appeal, no costs besides disbursements to be included.